UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD GODMAR,

        Plaintiff,

v.

                                      Case No. 14-cv-12153

HEWLETT PACKARD COMPANY,        Honorable Gershwin A. Drain
HEWLETT PACKARD COMPANY
DISABILITY PLAN, and
SEDGWICK CLAIMS MANAGEMENT
SERVICES, INC.,

        Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT
ON THE ADMINISTRATIVE RECORD [#31], AND DENYING
PLAINTIFF'S MOTION FOR JUDGMENT [#32]**

**I. INTRODUCTION**

On May 30, 2014, Donald Godmar ("Plaintiff") commenced the instant action against the

Hewlett Packard Company, Hewlett Packard Welfare Benefits Plan, and Sedgwick Claims

Management Services Inc. (collectively "Defendants"). *See* Dkt. No. 1. In the original

Complaint, Godmar asserted that, by denying his claim for disability benefits, the Defendants

breached the terms of an employee benefit plan in violation of the Employment Retirement

Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 *et seq. See id.*

Plaintiff filed his First Amended Complaint on June 2, 2014. *See* Dkt. No. 6.  On July 18,

2014, the Court entered a Stipulated Order striking the Plaintiff's jury demand and granting

Plaintiff leave to file a Second Amended Complaint. *See* Dkt. No. 21.  In accordance with the

Court Order, a Second Amended Complaint was filed on July 22, 2014. *See* Dkt. No. 22. On

October 14, 2014, the Administrative Record was filed under seal in accordance with Local Rule 5.2(a), and the Court's Case Management Scheduling Order for Review of ERISA Administrative Denial of Benefits. *See* Dkt. No. 29 (citing Dkt. No. 26).

Presently before the Court are the parties' Cross-Motions for Judgment on the Administrative Record. *See* Dkt. Nos. 31, 32. Both Motions have been fully briefed and a hearing took place on March 27, 2015.  For the following reasons, the Court will **GRANT** Defendants' Motion for Judgment on the Administrative Record [#31] and **DENY** Plaintiff's Motion for Judgment [#32].

## II. FACTUAL BACKGROUND

Donald Godmar ("Plaintiff") began working for the Hewlett Packard Company ("HP") in 1988 as a Project Manager.  By the time he applied for disability benefits, Godmar was employed as a Customer Project/Program Manger V.  (AR0227).  Godmar was typically at the client site between 8-10 hours per day, and he was responsible for managing between 18 and 40 people per project. *Id.*  As a senior program manager, Godmar was continuously required to make independent judgments in order to ensure that projects were delivered on time and under budget. Godmar was required to travel by air about once every six weeks. (AR0229).

On September 20, 2009, Godmar injured his left leg in a water skiing accident. As a result of the accident, Godmar dislocated his left tibia and fibula and sustained a left tibia plateau fracture, a torn left meniscus, and a torn left MCL. (AR465). Additionally, Plaintiff damaged his left peroneal, femoral, and sciatic nerves; his left thigh muscle; his Achilles tendon; and ligaments in his left ankle. *Id.* Godmar also ruptured his plantar fascia in his left foot. *Id.*

Godmar's injuries caused him to undergo at least ten surgeries and procedures, occurring from October of 2009 to May of 2013. (AR1785). These procedures included trials with spinal

cord stimulators, numerous pain pump trials, reconstructive surgeries, a complete knee replacement surgery, and external/internal neurolysis surgery. *Id.* Godmar attempted to continue to work for HP, but, over time, he contends the various surgeries and procedures caused so much pain that he was disabled.

On June 1, 2012, Godmar applied for disability benefits. (AR0135). On June 4, 2012, as a part of his application for benefits, Godmar included a Physician's Certification of Disability Benefits submitted by David Schwarz, D.O., ("Dr. Schwarz"). (AR0394-AR0396). The Certification of Disability Benefits indicated that Godmar was "unable to work" for the period spanning June 1, 2012 through July 15, 2012 due to "pain/meds." (AR0394). After receiving Godmar's claim on June 4, 2012, Sedgwick Claims Management Services Inc. ("Sedgwick") ordered records from Godmar's providers to assess his medical condition. (AR0101-AR0111).

Sedgwick examined whether Godmar was "totally disabled" as defined by the Hewlett-Packard Company Disability Plan ("the Plan"). (AR001-AR0100). Under the Plan, "total disability," means that "following the initial twenty-four month period after onset of the injury or sickness the Participant is continuously unable to perform any occupation for which he is or may become qualified by reason of his education, training, or experience." (AR0009). Under the terms of the Plan, "the determination of total disability shall be made by the Claims Administrator on the basis of objective medical evidence." (AR0010).

On July 30, 2012, Sedgwick issued a decision approving benefits for the period of June 1, 2012 through June 30, 2012. (AR1189-AR1192). However, also on July 30, 2012, Sedgwick terminated Godmar's benefits effective July 1, 2012. *Id.* The termination was based, in large part, on Sedgwick's finding that the medical documentation provided by Godmar's treating

physicians did not contain objective findings to support Godmar's inability to perform his usual and customary job duties. *Id.*[1]

Sedgwick notified Godmar of his right to appeal the decision, which Godmar did on August 14, 2012. (AR1192) (notifying right to appeal); (AR0465-AR0477) (Godmar Appeal). In the appeal, Godmar reported, for the first time, that he was restricted from driving, and was sleeping up to 20 hours a day. (AR0467). Sedgwick reviewed the appeal, the supporting documentation, and the administrative record, but, ultimately, upheld its decision denying Godmar continued disability benefits as of July 1, 2012. (AR1412).

Sedgwick did award Godmar benefits for the period of August 15, 2012 through August 28, 2012, due to do Godmar's time spent in the Brighton Recovery Unit as a result of an opiate addiction stemming from Godmar's narcotic pain medications. *Id.* However, Sedgwick otherwise denied Godmar's appeal after forwarding his entire medical file and history to Marcus Goldman, M.D., board certified in Psychiatry ("Dr. Goldman"),  and Richard Kaplan, M.D., board certified in Physical Medicine and Rehabilitation Pain Management ("Dr. Kaplan") for review. *Id.*

On November 1, 2012, Sedgwick received a letter from Troy Haney, Godmar's former counsel, requesting various documents and asking whether Sedgwick would consider additional documentation on Godmar's behalf. (AR1061-AR1065). Sedgwick responded on December 10, 2012, providing Godmar's attorney with a full copy of Godmar's claim and agreeing to review new or additional information so long as it was not duplicative. (AR1102-AR1103).

Godmar submitted a 46-page appeal letter with 28 attachments on March 14, 2013. (AR1196-AR1241). Sedgwick again referred all medical documentation, along with the appeal letter to Dr. Goldman and Dr. Kaplan. (AR2019-AR2026) (Goldman); (AR2027-AR2033)

---

[1] The Plan defines "Usual Occupation" as, "the customary work assigned to the Participant by the Participating Company which employs the Participant and performed on the Participant's customary schedule. . . ." (AR0012).

(Kaplan). Additionally, Sedgwick referred Godmar's records to James Tran, M.D., certified in neurosurgery ("Dr. Tran"). (AR2005-AR2014).

The most notable documentation contained in Godmar's appeal came from Dr. Schwarz and a Dr. Jeffrey Rosenberg of Prizm Pain Management Specialists ("Dr. Rosenberg"). Dr. Rosenberg diagnosed Godmar with Complex Regional Pain Syndrome, (AR1166) and sent Sedgwick a Physician's Certification for Disability Benefits on December 13, 2012. (AR1092). On February 25, 2013, Dr. Schwarz sent a Physician Statement of Disability reiterating everything he had previously communicated to Sedgwick along with his conclusion that Godmar was disabled. (AR1155-AR1156).

As part of his second review, Dr. Kaplan spoke with Dr. Rosenberg. After consulting with Dr. Rosenberg and reviewing Dr. Rosenberg's findings, Dr. Kaplan concluded that the "overwhelming" preponderance of the evidence suggest that Godmar's return to his usual occupation "would not only be possible, but likely therapeutic particularly given [Godmar's] specific physical limitations and high level of cognitive function as appears to be the case from the record." (AR2031). In sum, Dr. Kaplan's opinion was strengthened by consulting Dr. Rosenberg. *Id.* Dr. Goldman's opinion was also unchanged after considering the additional medical records and the second appeal letter. (AR2021).

Dr. Tran initially found, from a neurosurgery perspective, that there was no impact on Godmar's ability to function because there was no evidence of neurologic defects. (AR2010). Sedgwick requested that Dr. Tran make additional attempts to contact Dr. Rosenberg and a Dr. Angel Rigueras who was Godmar's primary pain management physician. (AR2070). Dr. Rosenberg stated he was unable to comment on Godmar's disability status, while Dr. Rigueras maintained that Godmar was disabled due to lumbar radiculopathy, neuropathy, and knee pain.

(AR2140-AR252). Ultimately, on May 28, 2013, after submitting four reports and consulting with Godmar's physicians, Dr. Tran concluded that his opinion remained the same, because his conversations with the attending providers did not reveal evidence of loss of function in Godmar that would preclude Godmar from performing his occupation. (AR2152).

On June 4, 2013, Sedgwick affirmed its previous decision that Godmar was not "Totally Disabled," except for the period of August 14, 2012 through August 29, 2012. (AR2174-AR2177). On January 1, 2014, Godmar's physicians authorized him to return to work, and he returned in February of 2014.

## III. DISCUSSION

### A. STANDARD OF REVIEW

A denial of benefits under an ERISA plan "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 103, 115 (1989). The Sixth Circuit requires an administrator or fiduciary to be granted "a clear grant of discretion" before a Court may replace the *de novo* standard of review. *Wulf v. Quantum Chemical Corp.*, 26 F. 3d 1368, 1373 (6th Cir. 1994).

"When conducting a *de novo* review, the district court must take a 'fresh look' at the administrative record but may not consider new evidence or look beyond the record that was before the plan administrator." *Wilkins v. Baptist Healthcare Sys.*, 150 F. 3d 609, 616 (6th Cir. 1998). "When a court reviews a decision *de novo*, it simply decides whether or not it agrees with the decision under review." *Perry v. Simplicity Eng'g*, 900 F. 2d 963, 966 (6th Cir. 1990). Under the *de novo* standard, the court does not presume the correctness of the administrator's benefits determination nor does it provide deference to its decision. *Id.* at 966.

However, if a plan grants the administrator discretion, the administrator's decision is reviewed under the "*highly deferential* arbitrary and capricious standard." *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991) (emphasis added).   Under this standard, decisions are not arbitrary and capricious if the decision to terminate benefits was the product of deliberate principled decision-making and based on substantial evidence. *Killian v. Healthsource Provident Administrators, Inc.*, 152 F. 3d 514, 520 (6th Cir. 2005). "[T]he arbitrary or capricious standard is *the least demanding* form of judicial review of administrative action and when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v.  Kentucky Finance Cos.  Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (emphasis added).

Under the arbitrary and capricious standard, the Court can overturn the administrator's decision "only by finding that they abused their discretion–which is to say, that they were not just clearly incorrect but downright unreasonable." *Fuller v.  CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir. 1990); *see also University Hospital of Cleveland v.  Emerson Elec.  Co.*, 202 F.3d 839, 846 (6th Cir.  2000).   "It is only if the court is confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of the evidence that it may conclude that a decision was arbitrary and capricious." *Erickson v.  Metropolitan Life Ins. Co.*, 39  F.Supp. 2d 864, 870 (E.D. Mich. 1999).

Here, the parties do not dispute that the Plan granted discretionary authority to the Claims Administrator to interpret and apply the Plan's terms and determine eligibility for benefits. *See* (AR0039) (outlining the "Administration and Operation of the Plan"); Dkt. No.31 at 22-23 (Defendants' acknowledgement of Claims Administrator's discretion and the applicability of the

arbitrary and capricious standard); Dkt. No. 32 at 8-9 (same for Plaintiff).  Accordingly, this Court's review of the denial of benefits will be made under the arbitrary and capricious standard.

   **B.  LEGAL ANALYSIS**

   Godmar's first argument is that Sedgwick acted in an arbitrary and capricious manner by approving disability benefits for June 1, 2012 through June 30, 2012, but then denying benefits as of July 1, 2012.  According to Godmar, Sedgwick's decision to deny him disability benefits was arbitrary and capricious because there were no explanations given by Sedgwick for its decision, and no changes in his condition warranting the denial of benefits.

   Additionally, Godmar contends that Sedgwick wrongfully disregarded his subjective reports of symptoms. Specifically, Godmar takes issue with the methods used by Sedgwick, because he feels that Sedgwick's use of file reviews was arbitrary and capricious. According to Godmar, Sedgwick should have conducted an independent medical examination.

   After reviewing the record, the Court disagrees with Godmar and finds that the Defendants did not act in an arbitrary and capricious manner. Although Sedgwick initially found Godmar to be disabled, the Court finds that Sedgwick reasonably reversed course after reviewing additional information.   Furthermore, the Court finds that Sedgwick provided Godmar a thorough and comprehensive review as a matter of law.

   **1.  The Court does not find Sedgwick's initial decision was arbitrary and capricious after Sedgwick provided reasons for reversing its course on its initial disability decision, and relied on objective evidence to determine that Godmar was not prevented from performing the functions of his usual occupation.**

   The Sixth Circuit has held that the cancellation of benefits in the absence of evidence showing that a claimant's condition had improved, and without an explanation for the apparent discrepancy from earlier assessments, is arbitrary and capricious. *See Kramer v. Paul Revere Life*

*Ins. Co.,* 571 F.3d 499, 507 (6th Cir. 2009) ("[T]here is no explanation for the decision to cancel benefits[.]").

However, a year later, the Sixth Circuit clarified and narrowed the scope of its decision in *Kramer* by noting that the decision was not "a wholesale endorsement of the notion that a lack of evidence of improvement is sufficient unto itself to prove a plan administrator's decision arbitrary and capricious." *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010).

The Sixth Circuit emphasized that a plan administrator who reverses course is required to have *a reason* for the change; to do otherwise would be the very definition of "arbitrary and capricious." *Id.* at 984 (emphasis in original); *see also McCollum v. Life Ins. Co. of N. Am.*, 495 Fed. Appx. 694, 704 (6th Cir. 2012) ("The plan administrator must have *some* reason for the change.") (emphasis added).

However, the Sixth Circuit stressed that "[i]t does not follow . . . either logically or from our decision in *Kramer*, that the explanation *must* be that the plan administrator has acquired new evidence demonstrating that the participant's medical condition has improved." *Morris*, 399 F. App'x at 984 (emphasis in original). To the contrary, the Sixth Circuit found that "the ultimate question is whether the plan administrator had a rational basis for concluding that [a plaintiff is] *not disabled* at the time of the new decision." *Id.* (emphasis in original) (brackets supplied).

Here, Godmar contends that Sedgwick's decision to terminate Plaintiffs benefits lacked evidence and was arbitrary and capricious because none of his conditions improved. *See* Dkt. No. 32 at 22; Dkt. No 34 at 22. However, as the Sixth Circuit stated, an administrator is not required to provide new evidence "demonstrating that the participant's medical condition has improved." *Morris*, 399 F. App'x at 984.

As discussed, "the ultimate inquiry is whether the plan administrator had a rational basis for concluding that [a plaintiff is] *not disabled* at the time of the new decision." *Id.* (emphasis in original) (brackets supplied). Looking at the facts here, Sedgwick has provided a reasonable explanation for reversing course and concluding that Godmar was not disabled.

After reviewing the record, Sedgwick's Case Notes Summary Report ("the Summary Report") indicates that the initial benefit approval was "[b]ased on the given medical information[,]" which provided "sufficient objective medical information to support initial disability and prevent [Godmar] from performing his usual and customary job duties." (AR0102).

However, prior to explaining the benefit approval, the Summary Report indicates that Sedgwick's initial approval of disability benefits was made "to prevent [a] lapse in benefits *while obtaining additional information for review*" of "medical information requested." (AR0102) (emphasis added). The RN assessment in the Summary Report indicates that the medical information initially provided only "substantiate[d] disability from [June 1, 2012] to [June 15, 2012]."*Id.* Notably, the Summary Report shows that "[b]enefits beyond [June 30, 2012] [were] pending receipt and review of medical information requested." *Id.*

Once Sedgwick obtained the medical information requested, and reviewed the Records throughout July of 2012, Sedgwick determined that "[c]ontinued benefits beyond [June 30, 2012] [were] denied due to lack of objective medical evidence to support continued disability." (AR0109). The Defendants explain their rationale for the denial of benefits as follows: "While Godmar was self-reporting supposedly disabling pain, his physician[s] noted evidence to the contrary." Dkt. No. 35 at 15.

Specifically, the Defendants point out that Sedgwick emphasized that Godmar's X-rays and EMG reports, along with Dr. Schwartz's treatment, indicated that Godmar's medical condition was improving:

> Dr. David Schwartz, Godmar's primary physician, reduced the number of pain medications Godmar was taking, X-rays of Godmar's left foot showed no acute fracture or dislocation, and the EMG report on June 26, 2012, showed evidence most compatible with left sciatic or common perineal mononeuropathy with mild axonal injury. By comparison to a study done on April 15, 2010, Godmar showed significant improvement.

Dkt. No. 35 at 15-16 (citing (AR1189-AR1192)). The Defendants further note that "[e]ven in Godmar's self-reporting, he told Dr. Rigueras that overall symptoms were improved by 50%[.]" Dkt. No. 35 at 16 (citing (AR0449)). The Defendants highlight that "Dr. Rigueras advised that no alterations or restrictions to work or activity were required." *Id.* (citing (AR0447 –AR0452)).

Godmar's disagreement with the methods used by the Defendants in reaching their decision will be addressed below. Nevertheless, with respect to the reasons advanced by the Defendants for reversing course on their initial decision, the record makes it clear that the plan administrator both possessed and explained a rational basis for concluding that Godmar was not disabled at the time of reversing its initial decision.

**2. The Court does not find Sedgwick's review was arbitrary and capricious after Sedgwick provided Godmar with two opportunities to appeal his decision regarding the denial of benefits, and had three physicians consult with—and review multiple reports from— Godmar's physicians.**

The Sixth Circuit has found that "reliance on a file review does not, standing alone, require the conclusion that [the administrator] acted improperly." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). In fact, the Sixth Circuit has stated there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Id.* at 296.

-11-

Nevertheless, the Sixth Circuit has noted that the decision to conduct file reviews, as opposed to physical examinations, is *a factor* properly considered in determining whether a plan administrator's decision was arbitrary and capricious. *See*, *e.g.*, *Rose v. Hartford Financial Services Group, Inc.,* 268 Fed. Appx. 444, 450 (6th Cir. 2008); *Hunter v. Life Ins. Co. of North America,* 437 Fed. Appx. 372, 378 (6th Cir. 2011) ("The failure to perform a physical examination is one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician.").

As it pertains to this case, the Sixth Circuit has found that "the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan— may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Helfman v. GE Group Life Assur. Co.,* 573 F.3d 383, 393 (6th Cir. 2009) (quoting *Calvert,* 409 F.3d at 296).

The decision to rely solely on a file review becomes relevant when the file reviewer must make credibility determinations. *See*, *e.g.*, *Hunter,* 437 Fed. Appx. at 378 ("[T]he lack of a physical examination is particularly troublesome where, as here, the file reviewers make critical credibility determinations."); *see also Calvert,* 409 F.3d at 297 n. 6 ("[T]here is nothing inherently improper with relying on a file review. . . . Where, as here, however, the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate.").

In such cases, given the inherent difficulties of making credibility determinations using only a file review, the reviewer must follow reasonable procedures in deciding whether a claimant is disabled. *See*, *e.g.*, *Bennetts v. AT & T Integrated Disability Serv. Ctr.*, 25 F.Supp.3d

1018, 1031 (E.D. Mich. 2014) (citing *Combs v. Reliance Std. Life Ins. Co.,* 2012 WL 1309252, at

*9–11 (S.D. Ohio April 12, 2012)). Courts have found that "reasonable procedures" include

requiring "the file reviewer to perform a comprehensive, rather than selective, review of the

records when rejecting claimant's self-reported symptoms." *Id.* (citing *Ebert v. Reliance

Standard Life Ins. Co.,* 171 F.Supp.2d 726, 740 (S.D. Ohio 2001)).

A comprehensive review is particularly needed when there is objective medical evidence

of the underlying condition, which forms part of the basis of an opinion that a claimant is

disabled due to pain. *Ebert,* 171 F.Supp.2d at 740 (finding that where the record contained

evidence of physical conditions that could reasonably cause pain, it was a "complete misreading

of the medical records . . . to say that Plaintiff's complaints of pain or weakness . . . are

subjective and unverifiable.").

However, even where there is no objective medical evidence, a file reviewer may not

simply disregard subjective reports of symptoms. *Calvert,* 409 F.3d at 296. The Sixth Circuit has

specifically held that reviewers "may not arbitrarily repudiate or refuse to consider the opinions

of a treating physician." *Glenn v. MetLife,* 461 F.3d 660, 671 (6th Cir. 2006). In sum, the

reviewer's decision denying benefits must be the result of a "deliberate, principled reasoning

process . . . supported by substantial evidence." *Bennett v. Kemper Nat'l Servs., Inc.,* 514 F.3d

547, 552 (6th Cir. 2008).

Here, HP specifically reserved the right to terminate benefits if a Participant willfully and

without justifiable cause refuses or fails to undergo an independent medical examination or

functional capacity evaluation required by the Claims Administrator. (AR0020).  Because the

Plan reserved the right to examine Godmar in person, the failure to do so raises questions.

*Helfman,* 573 F.3d at 393.  Nevertheless, as discussed, there is nothing inherently objectionable

or improper about relying on a file review by a qualified physician in the context of a benefits determination. *See Calvert,* 409 F.3d at 296; *id.* at 297 n. 6.

Instead, the Court must focus on whether Sedgwick and the reviewers employed reasonable procedures in deciding whether Godmar was disabled. *Bennetts*, 25 F.Supp.3d at 1031; *Combs,* 2012 WL 1309252, at *9–11. After reviewing the record in this case, the Court concludes that the reviewers performed comprehensive, as opposed to selective, reviews of Godmar's records when determining that Godmar was not "Totally Disabled," as defined by the Plan.

In this case, Sedgwick granted Godmar an initial appeal and also permitted him to add additional information following the denial of his first appeal. By the time Sedgwick denied Godmar's claim a second time, Sedgwick had consulted with three different independent reviewing physicians: Dr. Kaplan, Dr. Goldman, and Dr. Tran.

The reviewing physicians submitted a total of eight separate reports. *See* (AR0557-AR0561, AR2019-AR2026) (Dr. Goldman's reports); (AR0542-AR0547, AR2027-AR2033) (Dr. Kaplan's reports); (AR2005-AR2014, AR2061-2070, AR2110-AR2121, AR2123-AR2134) (Dr. Tran's reports). Within the reports, each of the reviewing physicians reviewed Godmar's medical record from a different medical perspective – Dr. Goldman reviewed the records from a psychiatric perspective, Dr. Tran reviewed the records from a neurosurgery perspective, and Dr. Kaplan reviewed the records from a physical medicine and rehabilitation perspective.

In each report, the reviewing physicians documented and reviewed Godmar's medical records and uniformly acknowledged that Godmar had previously suffered complex injuries to his lower left extremity. *See*, *e.g.*, (AR0542-AR0544) (Dr. Kaplan); (AR0558) (Dr. Goldman); (AR2005-AR2008) (Dr. Tran).  Nevertheless, the reviewing physicians uniformly concluded,

-14-

from their respective perspectives, that Godmar's medical records did not contain objective medical evidence supporting his position that he was disabled from performing his job.

Godmar argues that the Defendants acted in an arbitrary and capricious manner because he contends the reviewers summarily rejected his complaints regarding subjective symptoms and made improper credibility determinations. *See* Dkt. No. 34 at 23-24 (citing, amongst other cases, *Calvert,* 409 F.3d at 296 to state that a reviewer should not summarily reject subjective reports of symptoms); *id.* at 27 (citing *Bennetts*, 25 F.Supp.3d at 1031-32, to assert there were improper credibility determinations). A review of the record and facts, however, indicates that the Defendants did not act in an arbitrary and capricious fashion as a matter of law.

As an initial matter, Godmar undermines his own suggestion that his subjective complaints were summarily rejected by the reviewers. *Compare* Dkt. No. 34 at 23-24 (Godmar stating: "[A] reviewer may not disregard reports of symptoms. . . . [S]ummary rejection of complaints regarding subjective symptoms is the type of decision that is arbitrary and capricious, absent an independent medical examination."), *with id.* at 25 (Godmar stating: "Each reviewer noted the reports of pain and the surgeries."), *and id.* at 27 (Godmar Stating: "Sedgwick admitted that Plaintiff's pain was subjective at least twice[.]"). Consequently, Godmar's complaint that his subjective complaints were summarily rejected is undercut by his own acknowledgments that the reviewers noted and addressed his subjective reports of pain.

As evidenced in Godmar's brief, his real contention rests in the fact that the reviewers did not find he was disabled as a result of his subjective complaints. *See* Dkt. No. 34 at 27. Godmar cites *Bennetts* broadly to explain that "[d]espite numerous acknowledgments that [Godmar] underwent several procedures and experienced chronic pain, which was considered subjective and therefore required credibility determinations, Sedgwick conducted file reviews rather than

physically examining Plaintiff. This, in itself, was arbitrary and capricious." *Id.* (citing *Bennetts*, 25 F.Supp.3d 1018 (E.D. Mich. 2014), broadly to support his position).

However, Godmar's position is flawed because it is not in accordance with the law of the Sixth Circuit or the facts of this case. Godmar's position is incorrect as a matter of law because, as discussed previously, the fact that Sedgwick made its decision without conducting an Independent Medical Examination is not, by itself, determinative. *See Rose,* 268 Fed. Appx. at 450. Instead, Sedgwick's decision to rely on file reviews by the reviewers is merely one factor this court may consider in its analysis. *See Hunter,* 437 Fed. Appx. at 378.

It is important to clarify that the Court can still uphold the use of file reviews by Sedgwick *without* an Independent Medical Examination, so long as Sedgwick used reasonable procedures. *See*, *e.g.*, *Fant v. Hartford Life & Acc. Ins. Co.*, No. 09-12468, 2010 WL 3324974, at *10 (E.D. Mich. Aug. 20, 2010) (finding the termination of benefits was not arbitrary and capricious even though, "[s]ome of the factors identified by the Sixth Circuit [] weigh[ed] against [the] Plan Administrator[] . . . [because, n]onetheless, [the defendant's] decision followed a deliberate and principled reasoning process and thorough review of [the plaintiff's] records.").

Failure to use file reviews has been deemed arbitrary and capricious where the reviewers took it upon themselves to make credibility determinations about a claimant's subjective complaints. *See*, *e.g.*, *Bennetts*, 25 F.Supp.3d at 1031. Here, however, the record indicates that the reviewing physicians were *not* required to make such credibility determinations when finding that Godmar was not "Totally Disabled."

Godmar argues adamantly that the Defendants acted in an arbitrary and capricious fashion because Dr. Tran was "used in the instant case." Dkt. No. 34 at 26. Godmar maintains that Dr. Tran "did not examine the claimant, did not speak to his physicians, and concluded that

there was 'no clinical evidence' of functional limitation from the neck and shoulder pain despite the opinions of the claimant's treating physicians." *Id.*

Again, however, Godmar undercuts his own argument because he, himself, acknowledges that Dr. Tran consulted with Godmar's physicians. *See*, *e.g.*, Dkt. No. 32 at 20 (Godmar stating: "Tran also spoke to Gilmer[.] . . . [H]e finally did speak with Rosenberg[.] . . . Rigueras stated that Plaintiff was disabled[.]"); *see also* (AR2145, AR2151-AR2152) (noting calls with Dr. Gilmer, Dr. Rosenberg, and Dr. Rigueras).  Thus, the Court will disregard Godmar's assertion that Dr. Tran "did not speak to his physicians." Dkt. No. 34 at 26.

Instead, the Court will only consider Godmar's argument that Dr. Tran's conclusion was arbitrary in light of the opinions provided by Godmar's treating physicians that he was not "Totally Disabled." Reviewing Dr. Tran's conclusion, the Court finds that Dr. Tran did not summarily discount the subjective complaints of Godmar or the opinions of Godmar's physicians.

Instead, the record indicates that Dr. Tran weighed the opinions of Godmar's physicians and found that the opinions were inconsistent with objective medical evidence. *Compare*, *e.g.*, (AR2145) (Dr. Tran acknowledging April 04, 2013 discussion with Dr. Gilmer where Dr. Gilmer stated that Godmar had been unable to stand or walk), *and* (AR2151) (Dr. Tran acknowledging May 23, 2013 discussion with Dr. Rigueras, where he advised that claimant was disabled from July 2, 2012 to August 14, 2012 and from August 29, 2012 onward), *with* (AR1670) (Letter from Dr. Gilmer to Dr. Rosenberg indicating that Godmar's "Gait: Reveals the patient to have normal stance. Heel, toe, and tandem walking are performed without difficulty."), *and* (AR0448) (July 17, 2012 fax from Dr. Rigueras regarding "BPS Follow-Up Visit Notes" indicating, with respect to Work/Activity Status "No alteration or restrictions of work / activity required at this time.").

-17-

According to the record, Dr. Tran looked to objective medical evidence such as Godmar's EMG in June 2012, which "showed that there is improvement of the sciatic nerve mononeuropathy and mild axonal injury" and "an improvement compared to the EMG in 2010." (AR2145). Based on this objective medical evidence, Dr. Tran concluded that, "from a neurological perspective, the claimant was not disabled from his regular unrestricted occupation[.]" (AR2152). In light of these facts, the Court does not find that Dr. Tran's conclusion—or the Defendants reliance upon Dr. Tran—was arbitrary or capricious.

Furthermore, Dr. Tran was only one of three reviewers used in this case. Godmar also critiques the findings of Dr. Kaplan and Dr. Goldman. Nevertheless, the Court finds these critiques are also unpersuasive. For example, Godmar briefly argues that Dr. Goldman and the other reviewers selectively reviewed evidence. *See* Dkt. No. 34 at 28 (citing *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002)). Specifically, Godmar makes it a point to argue that "Rosenberg sent Sedgwick documentation describing Plaintiff's frequent hospitalizations[,] yet inexplicably Plaintiff was not approved for benefits during those times." *Id.*

As an initial matter, the Court notes Godmar failed to cite the documentation sent by Sedgwick describing frequent hospitalizations.[2] Moreover, Godmar fails to address the Defendants' retort to his contention. Defendants explain that the reviewers did not rely on the aforementioned records of Dr. Rosenberg because "Dr. Rosenberg's records [did] not reflect that Godmar was restricted from working as a result of any such procedures . . . [and] Dr. Rosenberg

---

[2] While the Court thoroughly reviewed the Administrative Record and the parties' submissions, the Court notes that it is improper for Godmar to assert wrongdoing by the Defendants and leave it to the Court to scour the 2,196 page Administrative Record in search of evidence to support his claim. *See, e.g.*, *McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted); *Crocker v. Comm'r of Soc. Sec.,* 2010 WL 882831 at *6 (W.D. Mich. 2010) ("This court need not make the lawyer's case by scouring the party's various submissions to piece together appropriate arguments.") (citation omitted).

did not note any such restrictions when he spoke with Drs. Kaplan and Tran." Dkt. No. 31 at 27 n. 12 (citing AR2030-AR2031, AR2057-AR2058, AR2152)).   As such, the Court finds Godmar's argument unavailing.

The Court reaches the same conclusion regarding Godmar's critique of Dr. Kaplan's review.[3]  Dr. Kaplan spoke with Dr. Rosenberg, who treated Godmar for pain management, and Dr. Kaplan found that "the medical data described by the claimant, his attorney and his physicians regarding the nature of his orthopedic and neurological deficit and related gait dysfunction and weakness to be fully consistent." (AR2030).

Nevertheless, Dr. Kaplan went on to note that "Dr. Rosenberg indicates . . . that essentially the question of the claimant's abilities comes down to a subjective report of pain." (AR2030); *see also* (AR2057-AR2058) (requesting that Dr. Rosenberg confirm—which he did—Dr. Kaplan's interpretation of their discussion, which described that "Dr. Rosenberg feels that [Godmar] has essentially subjective symptoms in terms of sedentary activities.").

Critically, Dr. Rosenberg, who treated Godmar for pain, was in agreement with Dr. Kaplan, Dr. Goldman, and Dr. Tran with respect to their opinions on Godmar's complaints of pain. Equipped with this information for his final conclusion, Dr. Kaplan, like Dr. Tran and Dr. Goldman, concluded that Godmar's claim for benefits was not supported by objective medical evidence. (AR2031) ("The overwhelming preponderance of this evidence suggests that return to this claimant's usual occupation would not only be possible, but likely therapeutic[.] . . .").

---

[3] In his Motion, Godmar criticizes Kaplan's report for making "no mention of the frequent travel that was required of Plaintiff." Dkt. No. 32 at 15 (citing AR0542-AR0547); *see also id.* at 19 (criticizing Kaplan for "not address[ing] any travel (a daily requirement for Plaintiff's job)."). Nevertheless, as the Defendants point out: "Even if Godmar was legitimately restricted from driving . . . such a restriction does not support a finding that he is totally disabled under the terms of the plan. Instead, it would be considered an accommodation in order for Godmar to perform with his 'usual occupation' per the language of the Plan." Dkt. No. 35 at 20 (citing *Storms v. Aetna Life Ins. Co.*, 156 Fed. Appx. 756, 759 (6th Cir. 2005), and *Adams v. Prudential Ins. Co. of Am.*, 280 F. Supp. 2d 731 (N.D. Ohio 2003), to note "[c]ourts have held that a claimant's inability to drive does not constitute a material and substantial job responsibility.").

To summarize, Godmar dedicates one page to describe the "sufficient objective evidence" he provided showing he was totally disabled as defined by the Plan. *See* Dkt. 34 at 23. Within this one page, Godmar devotes one sentence to the objective medical evidence, which he explains to be "the chronic, constant nature of Plaintiff's pain as a result" of his surgeries. *Id.* Godmar then asserts that the Defendants disregarded his subjective reports of symptoms. *Id.*

Notably, when Godmar describes his objective evidence, he points to his subjective reports of pain. The Defendants, on the other hand, point to documented objective evidence supporting their position that Godmar was not "Totally disabled," as defined by the Plan. *See*, *e.g.*, Dkt. No. 31 (citing (AR0429, AR0454) to note "where Dr. Schwarz's records do refer to objective findings, those findings show improvement in Godmar's condition – x-ray of Godmar's toe was negative for a fracture, and a comparison Electromyographic ("EMG") study showed improvement"); *see also* (AR0448) (July 17, 2012 fax from Dr. Rigueras regarding "BPS Follow-Up Visit Notes" indicating, with respect to Work/Activity Status "No alteration or restrictions of work / activity required at this time."); (AR1670) (Letter from Dr. Gilmer to Dr. Rosenberg indicating that Godmar's "Gait: Reveals the patient to have normal stance. Heel, toe, and tandem walking are performed without difficulty.").

Furthermore, Defendants also address why they disregarded Godmar's "objective" medical evidence—his subjective symptoms of pain—by noting that Godmar's physician for pain opined, "[t]he patient's behaviors during this clinic visit were inconsistent with the objective findings suggesting the potential for psychosocial-emotional dysfunction contributing to pain behaviors." Dkt. No. 31 at 27 (citing (AR1176)).

All things considered, Godmar was provided with three opportunities to demonstrate that he was "totally disabled" within the meaning of the Plan. Godmar was required to provide

objective medical evidence, and now, even before this Court, Godmar only argues that his subjective symptoms support a finding of Total Disability. On these facts, Godmar contends that the Defendants acted arbitrarily and capriciously by disregarding his subjective symptoms, despite the Defendants showing objective medical evidence to the contrary.

The Court will not accept Godmar's position.  Defendants permitted Godmar to appeal his denial of benefits twice. To review the appeals, the Sedgwick used three reviewing physicians who consulted with several of Godmar's physicians. As a result, the reviewing physicians provided a total of eight reports. Notably, Sedgwick even required Dr. Tran to follow up with Godmar's physicians multiple times before Sedgwick issued its final decision.

This being the case, the Court finds that Defendants' decision denying benefits was the result of a "deliberate, principled reasoning process . . . supported by substantial evidence." *Bennett v. Kemper Nat'l Servs., Inc.,* 514 F.3d 547, 552 (6th Cir. 2008); *see also Phillips v. Life Ins. Co. of N. Am.*, No. 1:10-CV-00064-R, 2011 WL 4435670, at *9 (W.D. Ky. Sept. 22, 2011) ("[The defendant's] medical reviewers did not dismiss out of hand the treating physicians' diagnoses or make credibility determinations about [the plaintiff's] symptoms; instead, they found the objective medical evidence was insufficient to show the presence of a disability.").

## IV. CONCLUSION

For the reasons discussed herein, the Court **GRANTS** Defendants' Motion for Judgment on the Administrative Record [#31], and **DENIES** Plaintiff's Motion for Judgment [#32].

SO ORDERED.

Dated: March 30, 2015

/s/Gershwin A Drain
Hon. Gershwin A. Drain
United States District Court Judge